UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

In re SEMILEDS CORPORATION          :     Civil Action No. 1:13-cv-04776-DLC
LITIGATION                          :
                                    :     CLASS ACTION
———————————————————————           :
                                    :     AMENDED COMPLAINT FOR
This Document Relates To:           :     VIOLATION OF THE FEDERAL
                                    :     SECURITIES LAWS
       ALL ACTIONS.                 :
——————————————————————— x

Lead Plaintiff Mohammad Yasir, together with plaintiff Jean C. Huard (collectively, "Plaintiffs"), allege the following based upon the investigation of Plaintiffs' counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by SemiLEDs Corporation ("SemiLEDs" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases, media reports and other public statements issued by or about the Company. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of purchasers of the common stock of SemiLEDs between December 9, 2010 and July 12, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Defendant SemiLEDs is a holding company for its wholly- and majority-owned subsidiaries and joint ventures that collectively develop, manufacture and sell high performance light emitting diode ("LED") chips and components that are used primarily in general lighting applications, including street lights and commercial, industrial and residential lighting.

3.      On August 6, 2010, SemiLEDs filed with the SEC a Form S-1 Registration Statement (the "Form S-1") offering to sell 6,037,500 common shares (including 787,500 common shares pursuant to overallotment options issued to the Company's underwriters) to the public at $17.00 per share. Several months later, on December 8, 2010, the Company's Form S-1, as amended, was declared effective by the SEC, and SemiLEDs sold 6,037,500 new common shares to the public and received approximately $92.7 million in net proceeds therefrom. The Company's shares are listed and trade under the symbol "LEDS" on the National Association of Securities Dealers Automated Quotation ("NASDAQ") Global Select Market.

4.      According to the Form S-1, which incorporated a Prospectus (the "Prospectus"), the principal purposes of the Company's initial public offering (the "IPO") were to obtain additional capital, create a public market for SemiLEDs common stock and facilitate the Company's future access to the public equity markets. Although the Company was headquartered in Boise, Idaho at the time of the IPO, its principal administrative, operational and manufacturing facilities were, and currently are, located in Taiwan, Republic of China.

5.      The Form S-1 and Prospectus (jointly referred to herein as the "Registration Statement") contained numerous materially false and misleading statements and failed to disclose material information which was required to be disclosed pursuant to the regulations governing their preparation.

6.      Specifically, the Registration Statement failed to furnish information, required by Item 11 of the instructions to Form S-1, about SemiLEDs pursuant to Item 303 of Regulation S-K [17 CFR §229.303].

7.      Item 303(a) of Regulation S-K requires issuers to "describe any known trends or uncertainties that have had, or that the registrant reasonably expects will have, a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." In addition, Instruction 3 of Item 303(a) of Regulation S-K requires that "the discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results," including matters that would have a material impact on future operations.

8.      The Registration Statement fraudulently failed to disclose that prices for SemiLEDs' products were then experiencing extreme pricing pressures. At the time of the IPO, unbeknownst to investors, SemiLEDs' major customers were demanding that the Company make extreme price

- 2 -

concessions for its products before they placed new orders, thereby significantly reducing the average selling price ("ASP") of SemiLEDs' products.

9.       Then, just 25 days after the IPO, Defendants, for the first time, revealed that the Company had been experiencing pricing pressure for its LED products. This news caused the price of SemiLEDs common stock to plummet more than 34% on extremely heavy trading volume.

10.      Thereafter, when Defendants acknowledged that SemiLEDs' customers were reluctant to purchase the Company's products because the price of its products were rapidly declining, they deceptively dismissed the notion that SemiLEDs was vulnerable to an impairment in the value of its inventory. Just weeks later, however, the Company announced an inventory impairment charge equal to more than 7% of the value of SemiLEDS' total inventory at the end of its previous quarter.

11.      As a result of Defendants' false and misleading statements and omissions, SemiLEDs shares traded at artificially inflated prices during the Class Period, reaching a high of $32.12 per share on December 21, 2010. As the truth about the Company's operations was revealed to the market during the short eight-month Class Period, the price of SemiLEDs stock declined more than 77%, from $25.76 per share on the Company's first day of trading to just $5.87 per share on July 12, 2011, the last day of the Class Period.

## JURISDICTION AND VENUE

12.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

13.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

- 3 -

14.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

15.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ Global Select Market, an electronic securities exchange located in this District.

## PARTIES

16.     Lead Plaintiff Mohammad Yasir, as set forth in his certification previously filed in this action and incorporated by reference herein, purchased the common stock of SemiLEDs during the Class Period and has been damaged thereby.

17.     Plaintiff Jean C. Huard, as set forth in his certification previously filed in this action and incorporated by reference herein, purchased the common stock of SemiLEDs during the Class Period and has been damaged thereby.

18.     Defendant SemiLEDs describes itself as a manufacturer of LED chips and components that are primarily used for general lighting purposes. The Company was incorporated in Delaware in January 2005 and maintains its principal executive offices in Taiwan, Republic of China. The Company's year-end is August 31.

19.     Defendant Trung T. Doan ("Doan") is the Company's co-founder and served, at all relevant times, as the Chairman of SemiLEDs' Board of Directors and its Chief Executive Officer. Defendant Doan signed the Form S-1.

20.     Defendant Anh Chuong Tran ("Tran") is the Company's co-founder and served, at all relevant times, as a Director on the Company's Board of Directors and the Company's President and Chief Operating Officer.  Defendant Tran signed the Form S-1.

- 4 -

21.     Defendant David Young ("Young") served, at all relevant times, as the Company's Chief Financial Officer. Defendant Young signed the Form S-1 and the Company's Forms 10-Q that were filed with the SEC during the Class Period.

22.     Defendants Doan, Tran and Young are collectively referred to herein as the "Individual Defendants."

23.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of SemiLEDs, were privy to confidential and proprietary information concerning SemiLEDs, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning SemiLEDs, as discussed in detail below. Because of their positions with SemiLEDs, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

24.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of SemiLEDs' business.

25.    The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

26.    The Individual Defendants, as senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, governed by the federal securities laws and is registered with the NASDAQ Global Select Market, had a duty to promptly disseminate accurate and truthful information with respect to SemiLEDs' financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of SemiLEDs common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

27.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of SemiLEDs common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding SemiLEDs' business, operations and management and the intrinsic value of SemiLEDs common stock; (ii) allowed the Company to obtain additional capital at favorable prices, create a public market for its common stock and gain

access to the public equity markets; and (iii) caused Plaintiffs and members of the Class to purchase SemiLEDs common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

28.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of SemiLEDs between December 9, 2010 and July 12, 2011, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

29.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SemiLEDs common stock was actively traded on the NASDAQ Global Select Market. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by SemiLEDs or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

30.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

31.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

32.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of SemiLEDs;

(c)     whether the price of SemiLEDs common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

33.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**SUBSTANTIVE ALLEGATIONS**

**SemiLEDs and Its Business at the Time of the IPO**

34.     Defendant SemiLEDs is a holding company for its wholly- and majority-owned subsidiaries and joint ventures that collectively develop and manufacture LED chips and components that are used primarily in general lighting applications, including street lights and commercial, industrial and residential lighting.  SemiLEDs sells its LED chips to packaging customers or to distributors, who in turn sell to packagers.  In addition, the Company packages a portion of its LED chips into LED components, which it sells to distributors and end-customers in selected markets.

35.     Although the Company was headquartered in Boise, Idaho at the time of the IPO, its principal administrative, operational and manufacturing facilities were, and currently are, located in Taiwan. The Registration Statement explains that, at the time of the IPO, SemiLEDs had two wholly-owned Taiwanese subsidiaries and interests in three joint ventures in China, Malaysia and Taiwan, including a 49% ownership interest in Xurui Guangdian Co., Ltd., or China SemiLEDs, which is based in Foshan, China.

36.     While SemiLEDs owns 49% of China SemiLEDs, the joint venture was set up so that SemiLEDs has control over the China SemiLEDs' Board of Directors. The Registration Statement disclosed that a majority of the members of China SemiLEDs' Board of Directors are employees of SemiLEDs, including Defendants Doan and Tran, who respectively serve as Chairman and Vice-Chairman of China SemiLEDs' Board of Directors.

37.     Although China SemiLEDs was in its early stage of development at the time of the IPO, the Registration Statement explained that SemiLEDs' future operating results would be significantly impacted by the performance of China SemiLEDs and that a substantial portion of SemiLEDs future business in China would be conducted through China SemiLEDs.

38.     The Registration Statement represented that the Company's sales were highly concentrated within a small group of large customers, with its ten largest customers accounting for 73.0%, 57.3% and 60.5% of its revenues during the years ended August 31, 2008, 2009 and 2010, respectively. As represented in the Registration Statement, these large customers regularly provided SemiLEDs with rolling product sales forecasts for the ensuing three- to six-month period.

## Materially False and Misleading Statements
## Made During the Class Period

39.     The Class Period begins on December 9, 2010.  On that date, SemiLEDs common shares began trading on the NASDAQ Global Select Market pursuant to the materially false and misleading Registration Statement.

40.     The Registration Statement, signed by each of the Individual Defendants, contained materially false and misleading statements and omitted to disclose material information which was required to be disclosed pursuant to the regulations governing its preparation.

41.     Specifically, the Registration Statement failed to furnish known information about the extreme pricing pressure SemiLEDs was then experiencing for its LED products.  At the time of the IPO, demand for SemiLEDs' products had diminished and its major customers were demanding that the Company make extreme price concessions for its products before placing new orders, thereby significantly reducing the ASPs of SemiLEDs' products.

42.     This information was required to be disclosed in SemiLEDs' Form S-1 pursuant to Item 11 of the instructions to Form S-1, which provides that companies disclose information called for under Item 303 of Regulation S-K [17 CFR §229.303].  Item 303(a) of Regulation S-K requires issuers to "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  In addition, Instruction 3 of Item 303(a) of Regulation S-K requires that "the discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results."

43.     Here, the Registration Statement failed to disclose that then-existing changes in the market for SemiLEDs' products were reasonably likely to have an adverse effect on the Company's

- 10 -

future operating results, thereby rendering the Registration Statement materially false and misleading.

44.     Rather, the Registration Statement contained materially false and misleading statements that portrayed a positive outlook for the Company's products.  For example, the Registration Statement falsely and misleadingly disclosed that "[w]e intend to expand our manufacturing capacity in Taiwan to meet the expected demand for our products."

45.     Moreover, the Registration Statement contained boilerplate risk disclosures with respect to adverse economic conditions and the ASPs for the Company's products.

46.     For example, the Registration Statement disclosed, in pertinent part, as follows:[1]

[W]e operate in highly competitive markets that are characterized by rapid technological changes and declining average selling prices.  Competitive pressures from existing and new companies *may* harm our business and operating results[.]

*          *          *

Fluctuations in supply and demand for LEDs pose serious risks to our prospects, business and results of operations.  Our industry, akin to the semiconductor industry, is highly cyclical and characterized by rapid technological change, rapid product obsolescence, declining average selling prices and wide fluctuations in supply and demand.  Our industry's cyclicality results from a complex set of factors, including, but not limited to:

- fluctuations in demand for end-products that incorporate LED chips and LED components;

- ongoing reductions in the number of LED chips and LED components required per application due to performance improvements; and

- fluctuations in the unutilized manufacturing capacity available to produce LED chips and LED components.

As market demand increases, if we are not able to increase our capacity or if we experience delays or unforeseen costs associated with increasing our capacity levels, we may not be able to achieve our financial targets.  Alternatively, *as* market demand decreases or as market supply surpasses demand, we may not be able to

---

[1]     Unless otherwise noted, all emphasis is added.

reduce manufacturing expenses or overhead costs proportionately. We believe that many of our competitors are, like us, adding MOCVD reactors and related equipment to increase manufacturing capacity. We expect a significant number of MOCVD reactors and related equipment will come on line in the next 12 months and increase LED chip supply. If the expected increase in supply outpaces any increases in future market demand, or *if* demand decreases, the resulting oversupply could adversely impact our sales and cause us to reduce our prices, which would lower our margins and adversely impact our financial results.

*     *     *

We anticipate that our gross margins will fluctuate from period to period as a result of the mix of products that we sell in any given period. If our sales mix shifts to a greater percentage of LED components, our average selling prices could be higher. However, LED components generally have lower margins than our LED chips, and therefore our overall gross margin levels would be adversely impacted.

Increased competition and the adoption of alternatives to our products, more complex engineering requirements, lower demand, over-capacity in the market and other factors *may* also lead to price erosion and, as a result, lower product margins and lower revenues. For example, some of our competitors have in the past reduced their average selling prices, and the resulting competitive pricing pressures have caused us to similarly reduce our prices, accelerating the decline in the gross margin of our products. We anticipate our competitors will continue to implement such competitive strategies from time to time in the future.

47.     None of these so-called risk disclosures were meaningful or advised investors of the true risks associated with the ASPs for the Company products as the disclosures deceptively discussed *potential risks* and not then-*known risks and events that the Company was already experiencing* with its products.

48.     On January 13, 2011, SemiLEDs issued a press release announcing its financial results for its fiscal year 2011 first quarter, the period ended November 30, 2010. For the quarter, the Company reported record revenue of $13.0 million, up 94% from the prior year, and net income of $3.8 million, or $0.11 per diluted common share.

49.     Following the Company's 2011 first quarter earnings announcement, SemiLEDs held a conference call with analysts and investors to discuss the Company's earnings and operations.

During the conference call, Defendants made positive statements about the Company's November

30, 2010 quarter results. For example, Defendant Doan stated, in pertinent part:

> We delivered record revenue growth of $13 million, a 94% year-over-year increase
> from $6.7 million in the first quarter of fiscal 2010. And GAAP net income of $3.8
> million or $0.11 per diluted share.
>
> Our revenues increased quarter-over-quarter and we continue to increase the volume
> LED chips and LED components, manufacture and so by optimizing our
> manufacturing process.
>
> Our 13% quarter-over-quarter revenue growth is driven by a 27% increase in LED
> component revenue and a slight increase in LED chip revenue, resulting from an
> increase in volume sold but offset by decline in ASPs.

Then, Defendant Doan also deceptively proclaimed that the Company was seeing strong demand for

its products, stating, in pertinent part:

> *We are seeing strong demand in lighting market, particularly driven by strong*
> *support from both the Chinese and Taiwanese government and also driven by high*
> *cost of energy.*
>
> China's National Development and Reform Commission recently announced that
> there were 28 winning companies, who will supply LED lighting products to 50
> demonstration projects in China and many of our customers and partners are in this
> group of named companies.
>
> We see this as a huge milestone for China market. These projects will set high
> standards for LED lighting in China that SemiLEDs will benefit due to our high
> performance products.
>
> China's LED Street Light program has also helped us drive adoption in the China
> market; especially the EMC, the Energy Management Contract project supported by
> China National Development and Reform Commission and the Ministry of Finance.
> We are in a great position to take advantage of this opportunity with our joint
> venture, China SemiLEDs.

50. Later on the conference call, Defendant Doan noted that the Company had recently

begun to experience pricing pressure for its products and that such pricing pressure was solely due to

the loss of a single customer, stating, in pertinent part:

> *We are experiencing pricing pressure that we did not see a month ago.* Our
> guidance for the second quarter reflects this pricing pressure. *I would like to make*

*clear that the impact on the guidance is primarily due to a particular customer going to a higher performance customer, competitor* based solely on price.

The magnitude of the pricing pressure was so large, we choose not to pursue this business in order to preserve our margins and use the additional capacity to pursue other customers. We maintain a strong relationship with this customer and will continue to compete for future opportunities

51.     As a result of this comment, securities analysts peppered Defendants with questions

in an attempt to learn more about pricing pressures associated with the Company's products:

Jesse Pichel, Analyst, Jefferies & Co.:

Hello, Mr. Doan, congratulations on your IPO and strong quarter. With respect to the increased pricing pressure that you're seeing at a customer, can you say if this pressure comes from existing high brightness LED suppliers or is it pricing pressure from new high brightness LED suppliers?

Defendant Doan:

There's really only one other company that offers high performance products like we do. And with one of these good companies, our chip can be -- is that from that company.

\*         \*         \*

Jed Dorsheimer, Analyst, Canaccord Genuity:

All right. And then may be just digging in, Trung, on the pricing pressure which you noted for the pressure in the gross margin you talked about earlier on the call, which geography, is this in the Chinese market, is it in the Taiwanese market? Could you elaborate on this large customer that you're going after that's causing the pricing pressure?

Defendant Doan:

It is in Taiwan.

Jed Dorsheimer, Analyst, Canaccord Genuity:

And it's for lighting products and are they shipping mostly into China? I'm just trying to get a handle on where you're seeing the recent pricing pressure.

Defendant Doan:

Yes, in this particular customer, all our chips that go to this customer are big die size, these are not small die size. So, for essentially for lighting.

- 14 -

Jed Dorsheimer, Analyst, Canaccord Genuity:

And do you know if the product is being used for street lighting, for indoor lighting? And then are they being used specifically in the Chinese market or elsewhere in the world?

Defendant Doan:

Mostly for I believe for flash and --

Jed Dorsheimer, Analyst, Canaccord Genuity:

For camera flash?

Defendant Doan:

Yeah.

Jed Dorsheimer, Analyst, Canaccord Genuity:

For camera flash, all right. And so was this is just to clarify, this pricing pressure, was this more market related or is this a function of you getting into a new customer and needing to be more aggressive to try and penetrate that account or is this a function of the market pricing.

Defendant Doan:

Well, as we said in our -- the call, this is from a particular customer that went to our competitors based solely on price. And the magnitude of the pricing pressure was so large that we choose not to pursue this business in order to preserve our margin and its additional capacity to pursue other customers. We believe matching the price would be in best interest of the company.

We see this pricing as an already aggressive and we choose not to participate in this irrational behavior. It is a dynamic market, but we believe that there is a long-term rational market that we will do very well in and believe it is better to focus on long-term opportunities and protect our margin profiles.

We maintain a strong relationship with this customer and we'll continue saying that we're able to compete for future opportunities.

52.    Then, after one analyst made an astute observation, Defendant Doan admitted that the

pricing pressure the Company was experiencing was not limited to a single customer, stating, in

pertinent part, as follows:

Jed Dorsheimer, Analyst, Canaccord Genuity:

- 15 -

*So, I'm sorry I'm just confused here, so if the pricing pressure caused you not to pursue that business, how is that affecting your gross margins?*

Defendant Doan:

Well, if we've seen that, we have a target margin of as our product and as we mentioned also in our call about when the product is in the market for sometime, we will release the benefit of the high ASP. So our product -- the ASP range we're targeting is 44, 48% and that is within the range that we gave you.

Jed Dorsheimer, Analyst, Canaccord Genuity:

But so you aren't -- I mean the gross margin contraction isn't a function of pricing pressure out of one specific customer because you're choosing not to go after that business. So is it just -- this is the normalized gross margin that we should expect on a go forward, is that what you're saying?

Defendant Doan:

*Well, I say this we see the pricing pressure on this particular customer and we decide not to pursue that business, but it doesn't mean that there is no other places.*

\*        \*        \*

Ben Pang, Analyst, Caris & Co.:

Thanks for taking my question and congratulations on a good quarter. Just to clear up the pricing scenario one more time or get the little more details, do you expect that pricing pressure resets the curve at the high end for all of your customers?

Defendant Doan:

*We have seen isolated case as we mentioned to you with this particular customer and there might be other cases coming but at this time we just deal with case-by-case.*

53. Notwithstanding the Company's record November 30, 2010 quarter revenues, Defendants' belated revelation about the pricing pressures then being experienced by the Company caused SemiLEDs common stock to close at $18.76 on January 13, 2011, a decline of *more than 34%*, or $9.87 per share, on extremely heavy trading volume, as part of the artificial inflation came out of the Company's share price.

- 16 -

54.     On January 21, 2011, SemiLEDs filed with the SEC its Form 10-Q, signed by

Defendant Young, for the 2011 first quarter ended November 30, 2010 (the "2011 Q1 Form 10-Q").

The 2011 Q1 Form 10-Q contained materially false and misleading statements about the Company's

revenues and gross profit in that, in violation of Item 303 of Regulation S-K, it failed to disclose the

effects that then-existing market pricing pressures were reasonably likely to have on SemiLEDs'

future operating results, including the reasonable likelihood that the pricing pressures would result

in: (i) lower revenue (as customers delayed purchases while the price for the Company's products

continued to plummet), (ii) lower gross profits and gross profit margins; and (iii) an impairment in

the value of SemiLEDs inventory.  Rather, the 2011 Q1 Form 10-Q highlighted that SemiLEDs'

business benefited from improved economic conditions and increased business activity and

government spending, stating, in pertinent part:

### *Revenues, net*

Our revenues increased by approximately 94.1% from $6.7 million during the
three months ended November 30, 2009 to $13.0 million during the three months
ended November 30, 2010.  The $6.3 million increase in revenues reflects a $3.6
million increase in revenues attributable to sales of LED chips and a $2.3 million
increase in revenues attributable to sales of LED components.

The increase in revenues attributable to sales of LED chips was due to a
49.7% increase in the volume of LED chips sold and a 6.1% increase in the average
selling price of LED chips as we introduced new, higher-priced models starting in
December 2009.

The increase in revenues attributable to sales of LED components was due to
a 203.2% increase in the volume of LED components sold, offset in part by a 8.7%
decrease in the average selling price of LED components due to continued market
competition and the general trend of lower average selling prices for products that
have been available in the market for some time.

The significant increase in volume of LED chips and LED components sold
was primarily due to increased end-user demand as a result of increased economic
activity in calendar year 2010, as the global economy began to recover from a
significant financial and economic downturn which began in late calendar year 2008
and which continued through most of calendar year 2009, and also due to our ability

- 17 -

to ramp up our production capacity and produce LED chips and LED components that met our customers' demand and technical specifications.

Recovery in government, consumer and corporate spending began to occur in certain countries beginning in the summer of calendar year 2009 and continued to gain pace in each of the quarters in calendar year 2010. *We believe that we benefited in particular, as the improvement in economic conditions and increased business* activity and growth was more pronounced in countries where a significant majority of our customers are based, such as in the northern Asian countries of Taiwan and China as well as in Russia. We believe that the increase in government spending, in particular, was a result of significant government financial stimulus programs initiated by various governments worldwide.

### *Gross Profit*

Our gross profit increased from $1.8 million during the three months ended November 30, 2009 to $6.6 million during the three months ended November 30, 2010. Our gross margin percentage increased from 27.4% during the three months ended November 30, 2009 to 51.0% during the three months ended November 30, 2010, primarily due to a change in our product mix to higher margin products and improved capacity utilization as we operated at or near full capacity as a result of increased customer demand for our LED chips and LED components, and improved production yields.

The 2011 Q1 Form 10-Q also included materially false and misleading representations about the

Company's disclosure controls and Defendants Doan's and Young's certifications thereon, stating,

in pertinent part:

Our management, with the participation of our chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures as of November 30, 2010. The term disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure. Our management recognizes that any controls and procedures, no matter how well designed and operated, can only provide reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of

our disclosure controls and procedures (as defined in the Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) required by Exchange Act Rules 13a-15(b) or 15d-15(b), our principal executive officer and principal financial officer have concluded that as of the end of the period covered by this report, our disclosure controls and procedures were effective at the reasonable assurance level to ensure that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and include controls and procedures designed to ensure that information required to be disclosed by us in such reports is accumulated and communicated to our management, including the principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure.

*     *     *

I, [Defendants Doan and Young], certify that:

1.      I have reviewed this Quarterly Report on Form 10-Q of SemiLEDs Corporation (the "registrant");

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d/-15(e)) for the registrant and have:

        a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

        b)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

        c)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has

materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

55.      The above representations about the Company's disclosure controls, and Defendants Doan's and Young's certifications thereon, were repeated, in all material respects, in the Form 10-Q that SemiLEDs later filed with the SEC during the Class Period.

56.      On April 5, 2011, SemiLEDs issued a press release announcing its financial results for its 2011 second quarter, the period ended February 28, 2011.  For the quarter, the Company reported revenue of $10.0 million, down 24% from the previous quarter, and a net loss of $1.2 million, or $0.05 per diluted common share.  Defendant Doan commented on the Company's poor results, stating, in pertinent part:

> While we believe the long term market opportunity of LEDs has not changed, *the quarter did not meet our expectations relative to revenue, EPS or gross margin due to the aggressive, competitive pricing environment* and our decision to preserve our market share.  Efforts to improve our gross margin include taking actions to improve our yield, transition to four inch wafers in our Taiwan facility, as well as ramping volume production of our new high brightness LED chip, I-Do, which delivers up to 135 lumens per watt, enabling us to provide our customers with a very cost effective lighting solution.

57.      Following the Company's 2011 second quarter earnings announcement, SemiLEDs held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, Defendant Doan admitted that SemiLEDs' customers were demanding

double-digit price concessions in January 2011 and that customers were delaying purchases while

the price for the Company's products continued to plummet, stating, in pertinent part:

> As we previously disclosed, this quarter, we were affected by the aggressive pricing
> environment [beginning] what we believe was an unreasonable request for a
> significant price reduction by a large customer.

> Today, the market environment is even more challenging. ***Demand is weak and the
> industry is experiencing significant pricing pressure resulting in limited visibility.
> In January, ASPs will drop -- will reduce by double digits, our customers have
> asked us to make price concessions.*** We decided to protect our market share and
> make these price concessions, which have materially affected our financial results.

> ***Furthermore, there is less demand today because customers are concerning about
> the rolling pricing environment.*** While we expect this situation to continue until
> calendar Q4, the long-term market opportunity and the driver of LED adoption have
> not changed.

Defendants also acknowledged that SemiLEDs' customers were reluctant to purchase the

Company's products because the price of its products were rapidly declining, stating, in pertinent

part:

> CJ Muse – Barclays Capital – Analyst:

> Okay, I guess what I am getting at is, in terms of the thesis that general lighting will
> require higher-end LEDs and there is less supply there and therefore pricing should
> hold up incrementally better at least and I guess would love your thoughts on what
> you're seeing on that front.

> Defendant Doan:

> Well, what we see, the pricing -- ***double-digit pricing erosion during the February
> timeframe has really made our customer very worry about ordering***, long-term
> ordering. We see that, the demand side, ***people don't want to be having built up
> inventory because of that.*** So that is where our forecast comes from.

>               *       *       *

> Steve Milunovich – Bank of America-Merrill Lynch – Analyst:

> Why do you think the demand is so weak? Is it mostly due to the China streetlamp
> softening or it actually seems to be broader than that at this point? And recall last
> quarter when you had that pricing pressure, you made the point that it happened very
> much at the end of the quarter. There wasn't much time to do anything about it. You

obviously have had time since, but it hasn't helped. So why do you think demand is so weak?

Defendant Doan:

Well, we are going to have *the environment of aggressing pricing environment with price eroding double-digit and very fast, dropping very fast*. It creates an issue with a lot of customers where they look at what they have in inventory for pricing drop (inaudible) them up. That creates big problems for many customers. We want to see a clear stable pricing environment.

Steve Milunovich – Bank of America-Merrill Lynch – Analyst:

So you are suggesting that the pricing pressure is causing the demand weakness, not the other way around?

Defendant Doan:

Well, a lot of customers are afraid to go on to our inventory. They look at it -- I bought it last month for this price. Now this month, the price changed. That creates a big problem -- that creates an issue for many companies.

58.    In response to these revelations, SemiLEDs common stock plummeted another 17%, or $2.50 per share, on extremely heavy trading volume, closing at $11.96 on April 5, 2011, as part of the artificial inflation came out of the Company's share price.

59.    During the 2011 second quarter conference call, while Defendants acknowledged that SemiLEDs customers were reluctant to purchase the Company's products because the price of its products were rapidly declining, Defendants Doan and Young deceptively dismissed the notion that SemiLEDs was vulnerable to an impairment in the value of its inventory, stating, in pertinent part:

Daniel Amir – Lazard Capital Markets – Analyst:

Thank you for taking my question. A couple questions here. First of all, back to the inventory issue, are we -- *is there a thought here about inventory write-off at some point or how should we look at this level of inventory just so you can give a little clarification on that?*

Defendant Young:

Today, if we sell at low enough price, we can sell them all. We think that the price is very steep, dropped last quarter and we are working on the inventory and selling them at this quarter.

Daniel Amir – Lazard Capital Markets – Analyst:

Okay. So you are basically going to reduce the price enough and you are going to just try to flush out the inventory, is that the idea?

Defendant Doan:

**Yes, we watch out for our inventory.  We don't want to grow so high, but we are actually -- we are working through the inventory right now.**  Yes, our inventory.

60.    On April 12, 2011, SemiLEDs filed with the SEC its Form 10-Q, signed by Defendant Young, for the 2011 second quarter ended Februray 28, 2011 (the "2011 Q2 Form 10-Q").  The 2011 Q2 Form 10-Q contained materially false and misleading statements about the Company's gross profit and operating income in that it failed to disclose, in violation of Item 303 of Regulation S-K, the reasonable likelihood that the Company may suffer an impairment in the value of its inventory, stating, in pertinent part:

**Gross Profit**

Our gross profit decreased from $3.2 million during the three months ended February 28, 2010 to $2.3 million during the three months ended February 28, 2011. Our gross margin percentage decreased from 41% during the three months ended February 28, 2010 to 23% during the three months ended February 28, 2011, primarily due to a significant decrease in the average selling prices for our LED chips and LED components, as a result of an unfavorable pricing environment in the three months ended February 28, 2011.  The decrease was also due to lower capacity utilization and a change in our product mix as we decreased our production of LED chips and increased our production of LED components, which are lower-margin products relative to LED chips, primarily in response to a change in customer demand, as well as a shortage in metal organic chemical compound.

61.    The statements referenced above in ¶¶44, 46, 48-52, 54, 56-57, 59 and 60 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)    that the Company was experiencing known, but undisclosed, pricing pressures for its products which were reasonably likely to have a material adverse effect on SemiLEDs' future revenues and operating income;

(b)    that the Company failed to disclose known events or uncertainties, including the reduction in demand for its products, the likely (and ultimate) loss of material revenues, materially lower gross profit and profit margins and an impairment in the value of its inventory that were reasonably likely to cause SemiLEDs' financial information not to be indicative of future operating results;

(c)    that the Company's disclosure controls were materially deficient and its representations concerning them were materially false and misleading;

(d)    that the certifications issued by Defendants Doan and Young associated with the Company's disclosure controls were materially false and misleading; and

(e)    that, based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, and its then-current business and future financial prospects.

62.    On July 7, 2011, SemiLEDs issued a press release announcing its financial results for its 2011 third quarter, the period ended May 31, 2011. For the quarter, the Company reported revenue of $5.6 million, down 43% from the previous year's third quarter, and a net loss of $5.1 million, or $0.19 per diluted common share. The Company's results for the quarter were adversely impacted by a $1.1 million inventory charge during the quarter, an amount equal to more than 7% of the value of the Company's total inventory at February 28, 2011.

63.    Then, on July 12, 2011, SemiLEDs filed with the SEC its Form 10-Q, signed by Defendant Young, for the 2011 third quarter ended May 31, 2011 (the "2011 Q3 Form 10-Q"). As illustrated in the following chart, the 2011 Q3 Form 10-Q revealed, for the first time, that *notwithstanding the $1.1 million inventory impairment charge recorded by SemiLEDs during the quarter ended May 28, 2011*, an amount equal to more than 7% of the value of the Company's total

inventory at February 28, 2011, the Company's inventory of finished goods *mushroomed by more than 53% during the quarter*:



64.     This massive increase in the amount of SemiLEDs' finished goods inventory signaled to the market that SemiLEDs was likely to record significant future inventory impairments.  In reaction to this news, SemiLEDs' stock price fell nearly 11%, or $0.71 per share, to close at $5.87 per share on July 12, 2011.

65.     The market for SemiLEDs common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, SemiLEDs common stock traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired SemiLEDs common stock relying upon the integrity of the market price of SemiLEDs common stock and market information relating to SemiLEDs, and have been damaged thereby.

66.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of SemiLEDs common stock, by publicly issuing false and misleading statements and omitting material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Such statements and omissions were materially false and misleading because they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

67.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about SemiLEDs' business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of SemiLEDs and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

### Additional Scienter Allegations

68.     As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts

- 26 -

regarding SemiLEDs, their control over, and/or receipt and/or modification of SemiLEDs' allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

69.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

70.     The Individual Defendants, because of their positions with SemiLEDs, controlled the contents of the Company's public statements during the Class Period. Each Individual Defendant was provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, these Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, each of these Defendants is responsible for the accuracy of SemiLEDs' corporate statements and are therefore responsible and liable for the representations contained therein.

71.     First, with respect to the reasonable likelihood that the pricing pressures would result in lower revenue, as customers delayed purchases while the price for the Company's products continued to decline, lower gross profits and gross profit margins and an impairment in the value of SemiLEDs inventory, Plaintiffs allege that this knowledge can be imputed to Defendants, including

- 27 -

Defendants Doan, Tran and Young who, as Company officers, knew or recklessly ignored facts related to the core operations of SemiLEDs.

72.     The scienter of the Defendants is also demonstrated by the fact that a relatively small group of customers account for a large percentage of SemiLEDs' sales. In fact, during the year ended August 31, 2010, its ten largest customers accounted for 60.5% of its sales. Accordingly, Defendants knew or recklessly ignored facts related to purchasing activities of the Company's customers given that a relatively small group of customers account for a large percentage of SemiLEDs sales.

73.     In addition, as represented in the Registration Statement, these large customers regularly provided SemiLEDs with rolling product sales forecasts for the ensuing three- to six-month period. Given these admitted facts, it defies credulity that Defendants did not know at the time of the IPO what they disclosed just *25* days later, that the Company had been experiencing pricing pressure for its LED products, the revelation of which caused the price of SemiLEDs common stock to plummet more than *34%* on extremely heavy trading volume.

74.     The scienter of Defendants is also underscored by the Sarbanes-Oxley mandated certifications of Defendants Doan and Young, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about SemiLEDs was made known to them and that the Company's disclosure-related controls were operating effectively.

75.     Defendants were also motivated to engage in the fraudulent course of conduct alleged herein in order to facilitate SemiLEDs' IPO so that the Company could obtain additional capital, create a public market for its common stock and gain access to the public equity markets prior to its release of known, but undisclosed, adverse information about the Company's operations.

### Loss Causation/Economic Loss

76.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of SemiLEDs common stock and operated as a fraud or deceit on Class Period purchasers of SemiLEDs common stock by failing to disclose and misrepresenting the adverse facts detailed herein. As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of SemiLEDs common stock declined significantly as the prior artificial inflation came out of the Company's stock price.

77.    As a result of their purchases of SemiLEDs common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused SemiLEDs common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $32.12 per share on December 21, 2010.

78.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of SemiLEDs' business and prospects. As the truth about the Company was revealed to the market, the price of SemiLEDs common stock fell significantly. These declines removed the inflation from the price of SemiLEDs common stock, causing real economic loss to investors who had purchased SemiLEDs common stock during the Class Period.

79.    The declines in the price of SemiLEDs common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in SemiLEDs common stock negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

80.     During the short eight-month Class Period, the price of SemiLEDs stock declined more than 77%, from $25.76 per share on the first day of Class Period to $5.87 per share on the last day of the Class Period, as the true state of SemiLEDs' operations was revealed to the investing public.

81.     The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of SemiLEDs common stock and the subsequent significant decline in the value of SemiLEDs common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

<strong>Fraudulent Scheme and Course of Business</strong>

82.     During the Class Period, Defendants had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time. In so doing, Defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of SemiLEDs common stock during the Class Period. The fraudulent scheme: (i) deceived the investing public regarding SemiLEDS' corporate governance, risk management, and internal controls; and (ii) caused Plaintiffs and other Class members to purchase SemiLEDs common stock at artificially inflated prices, causing them damage.

<strong>Applicability of Presumption of Reliance:<br>Fraud on the Market Doctrine</strong>

83.     At all relevant times, the market for SemiLEDs common stock was an efficient market for the following reasons, among others:

(a)     SemiLEDs common stock met the requirements for listing, and was listed and actively traded on the NASDAQ Global Select Market, a highly efficient, electronic stock market;

- 30 -

(b)     as a regulated issuer, SemiLEDs filed periodic public reports with the SEC and the NASDAQ Global Select Market;

(c)     SemiLEDs regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     SemiLEDs was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

84.     As a result of the foregoing, the market for SemiLEDs common stock promptly digested current information regarding SemiLEDs from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of SemiLEDs common stock during the Class Period suffered similar injury through their purchase of SemiLEDs common stock at artificially inflated prices and a presumption of reliance applies.

## No Safe Harbor

85.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, they were not accompanied by any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those

forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of SemiLEDs who knew that those statements were false when made or the speaker did not have a reasonable basis to make such statements.

## COUNT I

### Violation of §10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

86.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

87.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

88.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

89.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for SemiLEDs common stock. Plaintiffs and the Class would not have purchased SemiLEDs common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

90.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of SemiLEDs common stock during the Class Period.

## COUNT II

### Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

91.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

92.     The Individual Defendants acted as controlling persons of SemiLEDs within the meaning of §20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of SemiLEDs, and their ownership of SemiLEDs common stock, the Individual Defendants had the power and authority to cause SemiLEDs to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Mohammad Yasir as Lead Plaintiff and certifying Mohammad Yasir and Jean C. Huard as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Class Counsel;

B.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

- 33 -

D.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  November 15, 2013

POMERANTZ GROSSMAN HUFFORD
  DAHLSTROM & GROSS LLP
JEREMY A. LIEBERMAN

JEREMY A. LIEBERMAN
600 Third Avenue
New York, NY 10016
Telephone: 212/661-1100
212/661-8665 (fax)
jalieberman@pomlaw.com

*Counsel for Lead Plaintiff*

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
EVAN J. KAUFMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
ekaufman@rgrdlaw.com

HOLZER HOLZER & FISTEL, LLC
COREY D. HOLZER
MICHAEL I. FISTEL, JR.
MARSHALL P. DEES
200 Ashford Center North, Suite 300
Atlanta, GA 30338
Telephone: 770/392-0090
770/392-0029 (fax)

*Additional Counsel for Plaintiffs*

- 34 -